Lawson Edward **SCHABER**, Petitioner-Appellant,

v.

**E. L. MAXWELL**, Warden Ohio Penitentiary, Respondent-Appellee.

No. 15960.

United States Court of Appeals
Sixth Circuit.

July 14, 1965.

William J. Abraham and David K. Purkey, Columbus, Ohio, for appellant.

Joseph J. Jan, Chief Asst. Pros. Atty., Lucas County, Toledo, Ohio, William Saxbe, Atty. Gen., William C. Baird and John Cianflona, Asst. Attys. Gen., Columbus, Ohio, Harry Frieberg, Pros. Atty., Lucas County, Toledo, Ohio, on brief, for appellee.

Before PHILLIPS and EDWARDS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

PHILLIPS, Circuit Judge.

Petitioner was sentenced to death by electrocution, after having been found guilty on two counts charging him with murder in the first degree and murder in the first degree in perpetration of a robbery.[1] He is now confined in the Ohio State Penitentiary at Columbus, awaiting electrocution.

Execution has been stayed by this court pending appeal from the denial of an application for writ of habeas corpus filed by petitioner in the district court.

The single question presented on this appeal is whether petitioner was denied due process of law under the Constitution of the United States because of the act or omission of his court-appointed attorneys in conducting his defense upon the theory of insanity without filing a written plea of "not guilty by reason of insanity." An Ohio statute expressly provides that unless a written plea of "not guilty by reason of insanity" is filed, a defendant is "conclusively presumed to have been sane at the time of the commission of the offense."[2]

An oral plea of "not guilty" had been entered on behalf of petitioner by the state judge who conducted the arraignment proceedings, at a time when petitioner was not represented by counsel. His two attorneys who subsequently were appointed to represent petitioner at his criminal trial conducted his defense on his oral plea of "not guilty." Petitioner waived trial by jury in the presence of his counsel and elected to be tried by three judges pursuant to Page's Ohio Revised Code §§ 2945.05, 2945.06.

During his two day trial before the three-judge state court, petitioner's attorneys virtually conceded that he was guilty of the murder and robbery of a woman taxicab driver as charged in the indictment and pitched their defense on the claim of insanity or temporary insanity. In his opening statement, one of the attorneys for petitioner said:

"The defense expects to prove, if Your Honors please, that when he was five years old he fell out of an automobile and fell on his face and head. Ever since the time he was five years old, he has had blackouts, severe headaches, and, of course, we will prove that through the headaches he has been retarded in school.

"We expect to prove, Your Honors please, that at the time this murder was committed Mr. Schaber does not remember a thing, he claims, from that blackout. After he was told that this murder was committed and he made his own confessions to Detective Oehlers, the boy broke down and cried and realized what crime he was accused of committing.

"We expect to prove, Your Honors, that nothing we can say about the murder, the murder having been committed but we claim that at the time that the murder was committed Lawson Edward Schaber was temporarily insane."

At no time did the attorneys for petitioner enter a written plea of "not guilty by reason of insanity." No explanation appears in the record as to why the attorneys overlooked or failed to comply

1. Page's Ohio Revised Code § 2901.01.

2. Page's Ohio Revised Code § 2943.03 provides as follows:
"Pleas to an indictment or information are:
"(A) Guilty;
"(B) Not guilty;
"(C) A former judgment of conviction or acquittal of the offense;
"(D) Once in jeopardy;
"(E) Not guilty by reason of insanity.
"A defendant who does not plead guilty may enter one or more of the other pleas. A defendant who does not plead not guilty by reason of insanity is conclusively presumed to have been sane at the time of the commission of the offense charged. The court may, for good cause shown, allow a change of plea at any time before the commencement of the trial."
Section 2943.04 provides:
"Pleas of guilty or not guilty may be oral. Pleas in all other cases shall be in writing, subscribed by the defendant or his counsel, and shall immediately be entered upon the minutes of the court."

with the express requirement of the Ohio statute (see note 2) providing that unless such a plea is filed in writing, the defendant is conclusively presumed to have been sane at the time of the commission of the offense. Instead, counsel proceeded with the trial upon the completely erroneous impression that the above quoted opening statement constituted a sufficient plea of "not guilty by reason of insanity."

The record contains the affidavit of one of the court-appointed attorneys, executed April 17, 1964, which states unequivocally that "he honestly believes that, in making his opening statement to the court, he entered a plea of not guilty by reason of insanity."

The record in the criminal trial does not disclose that any member of the three-judge state court at any time advised the court-appointed attorneys of their mistake or informed petitioner that it would be necessary to change his plea from "not guilty" to a written plea of "not guilty by reason of insanity" in order for the court to pass upon insanity as a defense. On the motion for a new trial two of the members of the three-judge court expressed surprise that counsel for petitioner were relying upon a defense of insanity.

In the argument on the motion for a new trial, the following colloquy took place:

Attorney: " 'In any case in which insanity is set up as a defense,—' and, Your Honors, in this case that was set up, that this man was insane at the time he committed the crime."

Judge: "Just a minute, now. Where is that?"

Attorney: "In our opening statement, Your Honor, we said that

"This reads that in any case in which insanity is set up as a defense—"

Judge: "You said in the opening statement?"

Attorney: "That is right."

Judge: " * * * are you seriously contending in a capital case that the defense is set up in the opening statement?"

Attorney: "That is right, sure."

Judge: "What is the plea for? What is the arraignment for?"

Attorney: "At the time of the arraignment he pled not guilty. At the time of the trial we pleaded not guilty by reason of insanity."

Later in the same argument, the following took place:

Judge No. 1: "The thing that bothers me, he says he entered a plea of not guilty by reason of insanity."

Judge No. 2: "There is no plea by reason of insanity, no plea in this case."

Attorney: "In the opening statement, please."

Judge: "Is that a plea?".

Attorney: "We said we expect to show that he was insane at the time. There was insanity in the family, although it was not proved."

Thus the record establishes the following infirmities in petitioner's trial in the state court: His only defense was insanity, his attorneys virtually conceding that he was guilty of the robbery and murder with which he was charged; his attorneys tried the case upon the theory of insanity upon the mistaken belief that their opening statement constituted a plea of "not guilty by reason of insanity;" since the case was tried on an oral plea of "not guilty," petitioner was conclusively presumed to have been sane at the time of the commission of the offense charged; and, due to this mistake on the part of his court-appointed counsel, petitioner has been deprived of a trial upon the defense of insanity. Further, the record contains evidence raising doubts as to petitioner's sanity, as hereinafter set forth in some detail.

Under these facts, was petitioner's trial conducted by his court-appointed counsel in such an incompetent manner as to reduce it to a farce and mockery

of justice and a denial of due process of law? [3]

The district court held that the petitioner did not carry his burden of proof to show that his trial was a farce or mockery of justice. The court pointed out that in the opening statement of counsel for petitioner he alleged a history of mental disorders and charged that at the time of the crime petitioner was temporarily insane; that the prosecutor did not challenge the correctness of this statement; that no challenge was made to the evidence of the prosecutor that petitioner had committed the crime and that all the evidence for the defense was to the effect that Schaber was temporarily insane; and that at no time did the court or the prosecutor call attention to a failure to enter a proper plea.

The district court said:

"This Court cannot conceive of a situation in which three eminent and respected judges, with a total experience on the Common Pleas bench in excess of fifty years, trying a capital case without the intervention of a jury, would permit counsel for this defendant to make a farce and a mockery of the only defense available to him by failing to advise counsel that the evidence they were attempting to adduce could not be considered because they had failed to comply with the technicalities attendant to the offering of a plea."

It was the conclusion of the district court that the above quoted colloquy between the judges and counsel at the hearing on the motion for a new trial was "not meaningful." The court further stated:

"It is the considered opinion of this Court that the trial court, the prosecuting attorney and defense counsel all were of the opinion that the defense tendered and accepted by the court in the trial of Lawson Schaber was that of not guilty by reason of insanity.

"It is further the opinion of this Court that the technicalities of the entry of that plea were ignored by both the trial court and the prose-

---

3. Petitioner has exhausted his remedies in the state courts of Ohio. His conviction and sentence were affirmed by the Court of Appeals of Lucas County, Ohio, Sixth District, on September 8, 1961. On October 6, 1961, appeal was perfected to the Supreme Court of Ohio. In State v. Schaber, 172 Ohio St. 553, 179 N.E.2d 50, the court said: "The appeal as of right herein is dismissed for the reason that no debatable constitutional question is involved."

The Supreme Court of the United States denied certiorari, with Mr. Justice Douglas expressing the opinion that certiorari should be granted. 371 U.S. 853, 83 S.Ct. 53, 9 L.Ed.2d 88. Rehearing was denied. 371 U.S. 899, 83 S.Ct. 191, 9 L. Ed.2d 132.

The issue of incompetency of counsel does not appear to have been raised in any of the foregoing proceedings.

Subsequently, the question of incompetency of counsel was raised and presented to the Court of Appeals of Lucas County, Ohio, as a part of a motion for leave to file a second appeal. The court stated that:

"The Court, being fully advised in the premises, finds that the judgment and sentence against the defendant was heretofore reviewed on appeal in this Court; that defendant was represented by counsel at his trial and upon said appeal, and that no ground or cause is shown that defendant is entitled to a second review on said judgment, motion for leave to appeal is denied."

No appeal was taken from this denial.

Petitioner then filed in the Supreme Court of Ohio an action in habeas corpus alleging incompetency of counsel. This petition was denied, 176 Ohio St. 58, 197 N.E.2d 361, in a per curiam opinion in which the court said:

"Petitioner's contention that he was not represented by competent counsel is not well made inasmuch as this is a matter which must be raised by appeal rather than by habeas corpus. * * * It is noted that a motion for leave to appeal alleging lack of competent counsel was filed by petitioner in the Court of Appeals for Lucas County. The motion was denied. Petitioner could have appealed to this court on the ground that the Court of Appeals had abused its discretion in denying the motion. No such appeal was attempted.

cuting attorney. In fact, the chief assistant prosecuting attorney stated as much in his arguments to this Court.

"Therefore, this Court is of the opinion that an oral plea of not guilty by reason of insanity was made and accepted by the court; that both parties (prosecutor and defense) and the court tried the case on that theory and thus the defendant's constitutional rights were not infringed."

■■ We hold that the district court was incorrect in this conclusion. The law of Ohio is clear that a plea of insanity must be in writing. Page's Ohio Revised Code § 2943.04 (note 2). The above-quoted colloquy demonstrates to us that the trial court did not treat or accept the opening statement of counsel as a plea, one judge stating that "There is no plea by reason of insanity, no plea in this case;" and that the state court did not hear the case on the defense of insanity, and did not make any adjudication as to whether or not petitioner was sane at the time the crime was committed.

■ It is equally clear that under the law of Ohio (as quoted in note 2), a defendant who does not plead not guilty by reason of insanity "is *conclusively presumed* to have been sane at the time of the commission of the offense." (Emphasis supplied.)

As said by the Supreme Court of Ohio in a recent case involving similar facts, Buck v. Maxwell, 173 Ohio St. 394, 395, 182 N.E.2d 622:

"At arraignment, petitioner pleaded 'not guilty.' He made no attempt to change his plea to 'not guilty because of insanity.' Hence, under the above-quoted section, he was conclusively presumed to have been sane at the time of the commission of the offense for which he was tried."

For obvious reasons the courts are reluctant to grant writs of habeas corpus, or to reverse convictions on direct appeals, upon grounds of the incompetency of counsel.

■ In Scott v. United States, 334 F.2d 72, 73 (C.A. 6), cert. denied, 379 U.S. 842, 84 S.Ct. 81, 13 L.Ed.2d 48, this court stated the general rule as follows:

"Only if it can be said that what was or was not done by the defendant's attorney for his client made the proceedings a farce and a mockery of justice, shocking the conscience of the Court, can a charge of inadequate legal representation prevail. The fact that a different or better result may have been obtained by a different lawyer does not mean that the defendant has not had the effective assistance of counsel. Mitchell v. United States, 104 U.S. App.D.C. 57, 259 F.2d 787, 789–791, cert. denied, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86; O'Malley v. United States, 285 F.2d 733, C.A. 6th; Anderson v. Bannan, 250 F.2d 654, C.A. 6th."

In Tompsett v. State of Ohio, 146 F.2d 95, 98 (C.A. 6), cert. denied, 324 U.S. 869, 65 S.Ct. 916, 89 L.Ed. 1424, a case involving employed counsel, this court said:

"The incompetency or negligence of an attorney employed by a defendant does not ordinarily constitute grounds for a new trial and a fortiori will not be grounds for the application of the Fourteenth Amendment. * * *

"The concept of this rule is that the lack of skill and incompetency of the attorney is imputed to the defendant who employed him, the acts of the attorney thus becoming those of his client and so recognized and accepted by the court, unless the defendant repudiates them by making known to the court at the time his objection to or lack of concurrence in them. A defendant cannot seemingly acquiesce in his attorney's defense of him or his lack of it and, after the trial has resulted adversely to defendant, obtain a new

trial because of the incompetency, negligence, fraud or unskillfulness of his attorney.

"The foregoing rule has no application when it is made to appear that the defendant is ignorant of his rights and unacquainted with the course of proceedings in criminal cases. In that event if the attorney selected by such a defendant is so incompetent or dishonest or so improperly conducts defendant's case as to amount practically to no representation, the defendant is prejudiced and thereby deprived of a fair trial and a court should grant relief by use of the writ of habeas corpus. Coates v. Lawrence, D.C., 46 F.Supp. 414, affirmed in 5 Cir., 131 F.2d 110."

Frequently courts have drawn distinctions between cases involving court-appointed counsel and counsel employed by the defendant, his family or friends, saying in the latter case the ground of incompetency cannot be raised unless the defendant makes known his disapproval of the actions of his counsel. Annotation, 74 A.L.R.2d 1390; note, 78 Harvard Law Review 1434; but see Lunce v. Overlade, 244 F.2d 108, 74 A.L.R.2d 1384 (C.A. 7), United States ex rel. Darcy v. Handy, 203 F.2d 407 (C.A. 3). In the present case we are not concerned with this distinction, because petitioner's attorneys were appointed.

Recognition of the constitutional right of a defendant to effective counsel stems from Powell v. State of Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed. 158, wherein the Court spoke of giving "effective aid in the preparation and trial of the case." In later cases the Supreme Court has reiterated the constitutional right to effective representation by counsel. In Avery v. State of Alabama, 308 U.S. 444, 446, 60 S.Ct. 321, 84 L.Ed. 377, the Court stated that the guarantee of the Fourteenth Amendment is not satisfied by a mere formal apointment of competent counsel and that a denial of opportunity to confer, consult with the accused and to prepare his defenses, could

convert the appointment into a "sham." In Glasser v. United States, 315 U.S. 60, 76, 62 S.Ct. 457, 468, 86 L.Ed. 680, it was held that the defendant was denied "his right to have the effective assistance of counsel," because of conflict of interest. In White v. Ragen, 324 U.S. 760, 764, 65 S.Ct. 978, 980, 89 L.Ed. 1348, the Court said "[I]t is a denial of the accused's constitutional right to a fair trial to force him to trial with such expedition as to deprive him of the effective aid and assistance of counsel." In Hawk v. Olson, 326 U.S. 271, 276, 66 S.Ct. 116, 90 L.Ed. 61, the Court said that it was a violation of the Fourteenth Amendment for a state to force defendant to trial in such a way as to deprive him of the effective assistance of counsel. In Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83, while ruling against petitioner, the Court left little doubt that in a proper case evidence of incompetence of counsel could be grounds for dismissal of conviction. In Ellis v. United States, 356 U.S. 674, 675, 78 S.Ct. 974, 2 L.Ed.2d 1060, it was held that representation in the role of an advocate, rather than that of amicus curiae, is required.

As said by Judge Prettyman in Mitchell v. United States, 259 F.2d 787 (C.A. D.C.), cert. denied, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86:

" 'Effective' assistance of counsel obviously means something other than successful assistance.

"A bit of history helps us here. The Constitution itself says nothing about 'effective' assistance; it merely says 'Assistance'. The adjective 'effective' came into the law in Powell v. State of Alabama and was used by the Supreme Court to describe a procedural requirement. In a particularly heinous crime the trial court appointed the whole bar of the county to defend. But what was everybody's business was nobody's business, and the Court used the word 'effective' twice—regarding 'an effective appointment' and an assignment at such a time or un-

der such circumstances as to preclude 'effective aid' in preparation and trial.

"* * * It is clear from these opinions that the term 'effective' has been used by the Supreme Court to describe a procedural requirement, as contrasted with a standard of skill. The Court has never held that an accused is entitled to representation by a lawyer meeting a designated aptitude test. It has never used the term to refer to the quality of the service rendered by a lawyer. The Court has clearly established that an indigent accused is entitled to counsel, if he wants one, despite his inability to pay for the service; that appointed counsel must have reasonable opportunity to prepare for his task of defense; and that the lawyer so appointed must have no divergent interest. But the Court has not itself undertaken, nor has it imposed upon the inferior federal courts, the duty of appraising the quality of a defense." 259 F.2d at 789–790.

* * * * *

"We think the term 'effective assistance'—the courts' construction of the constitutional requirement for the assistance of counsel—does not relate to the quality of the service rendered by a trial lawyer or to the decisions he makes in the normal course of a criminal case; except that, if his conduct is so incompetent as to deprive his client of a trial in any real sense—render the trial a mockery and a farce is one descriptive expression,—the accused must have another trial, or rather, more accurately, is still entitled to a trial." 259 F.2d at 793.

In this opinion Judge Prettyman cites many other cases dealing with the problem of the effective assistance of counsel.

In MacKenna v. Ellis, 280 F.2d 592, 599 (C.A. 5), cert. denied, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78, the court stated:

"We interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance."

In United States v. Wight, 176 F.2d 376 (C.A. 2), cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586, it was said that the rule contemplates the conscientious service of competent counsel and that a mere perfunctory appearance for a defendant is not enough. To like effect is Turner v. State of Maryland, 303 F.2d 507 (C.A. 4), cert. denied, 364 U.S. 885, 81 S.Ct. 174, 5 L.Ed.2d 105.

It is held that invalidation of a conviction on allegations of ineffective counsel is not warranted by contentions as to the "competence of counsel" without more, Kennedy v. United States, 259 F.2d 883, 886 (C.A. 5), cert. denied, 359 U.S. 994, 79 S.Ct. 1126, 3 L.Ed.2d 982; the "quality of a defense" or matters of "counsel's judgment," Lyons v. United States, 325 F.2d 370, 376–377 (C.A. 9), cert. denied, 377 U.S. 969, 84 S.Ct. 1650, 12 L.Ed.2d 738; United States ex rel. Feeley v. Ragen, 166 F.2d 976 (C.A. 7); "general statements expressing dissatisfaction with trial results," Frand v. United States, 289 F.2d 693, 694 (C.A. 10); "a matter of trial strategy" McDonald v. United States, 282 F.2d 737, 740, 743 (C.A. 9); or when petitioner has alleged no grounds for a defense, Turner v. Maryland, 318 F.2d 852 (C.A. 4).

In Jones v. Huff, 152 F.2d 14 (C.A. D.C.) the court held:

"If it be true that the evidence against the accused was improperly admitted in violation of his Constitutional right, that witnesses who would have established his innocence were not called by his counsel, that no defense was offered by counsel although the accused was innocent, and that a document which would have established his innocence was not offered by counsel even though a

juror requested it, can it be said that the accused had a fair trial even within the stringent rule which we have stated and now apply? We think not. The combination of circumstances, if true, is exceptional. The allegations are improbable, but if they be true, it seems clear that the petitioner did not have a trial as we understand that term. These were not mere mistakes of counsel or errors in the course of the trial. If true, they constituted a total failure to present the cause of the accused in any fundamental respect. Such a proceeding would not constitute for the accused the fair trial contemplated by the due process clause of the Fifth Amendment."

In Lunce v. Overlade, supra, 244 F.2d 108 (C.A. 7), the court held that a petitioner who accepted services of Ohio counsel who knew nothing concerning Indiana law or procedure was deprived of the right to effective counsel, and that the incompetence of the defense was so apparent as to call for intervention by the officers of the state.

In a case somewhat analogous to the present case, Poe v. United States, 233 F.Supp. 173 (D.D.C.), defendant's counsel induced him not to testify, although there was no other defense, because counsel thought that the prosecution could use statements which were in fact inadmissible to impeach the defendant if he took the stand to deny the charges against him. Judge Skelly Wright, Circuit Judge sitting by designation, held:

"The failure to inform petitioner of the applicable law deprived him of a fair trial. Where the defense *is substantially weakened because of the unawareness on the part of defense counsel of a rule of law basic to the case,* the accused is not given the effective representation guaranteed him by the Constitution. People v. Ibarra, 34 Cal.Rptr. 863, 386 P.2d 487 (1963) (Traynor, J.)." (Emphasis added.) 233 F.Supp. 173, 178.

The record in the present case not only establishes that petitioner has been deprived of a trial on the defense of "not guilty by reason of insanity;" it also contains evidence to raise serious doubts as to the sanity of petitioner, thereby emphasizing the importance of having a trial on his defense of "not guilty by reason of insanity."

At the arraignment the prosecuting attorney asked, at the request of petitioner's mother, that he be given psychiatric examination before proceeding further with the case and the following docket entry was made:

"It appearing to the Court that the defendant herein is not sane, and that his sanity or insanity should be investigated before any further proceedings are had in this cause, it is now ordered that said Lawson Edward Schaber be committed to the Lima State Hospital for observation for a period not exceeding one (1) month, under and by authority of Sections 2945.37 and 2945.40 of the Revised Code of Ohio."

The Lima State Hospital report was given in the form of a letter to the Common Pleas judge and stated in relevant part:

"He has been observed and examined intensively. He has received psychiatric and psychological examinations and tests. In our opinion he understands the nature of the charges that are being brought against him and can cooperate in his own defense; he would, therefore, be considered sane."

The two court-appointed attorneys for petitioner had such serious doubts as to his sanity that they requested appointment of three psychiatrists to examine him, and their request was granted.

On November 30, 1962, Mr. E. L. Maxwell, Warden of the Ohio State Penitentiary at Columbus, respondent in this

proceeding, wrote a letter stating that petitioner "appears to be insane." [4]

Before the district court, the psychiatrist who had previously examined petitioner at the penitentiary testified that he was suffering from a mental disorder "but not severe enough to be considered as legal insanity." Additional testimony was given on the meaning of schizophrenia, simple type, by an expert witness called by the petitioner, but who had not examined the petitioner. This testimony was in part as follows:

"Schizophrenia is a word that is used to indicate a mental illness which is in medical terms psychosis, which is in legal terms insanity, and it encompasses both medical and legal insanity.

\* \* \* \* \*

"It is my opinion that word is never used except to indicate a person who has an illness that clearly indicates he is mentally deranged and incapable of determining right and wrong and incapable of counseling with his attorney and incapable of controlling his voluntary actions.

\* \* \* \* \*

"[T]he schizophrenics are really insane."

The record contains reports expressing opinions of psychiatrists to the effect that although petitioner is a schizophrenic, he met the M'Naghten "right-and-wrong" test of criminal responsibility that is in effect in Ohio. State v. Ross, 92 Ohio App. 29, 108 N.E.2d 77, app. dismissed, 158 Ohio St. 248, 108 N.E.2d 282; Annotation, 45 A.L.R.2d 1447. These reports were related to petitioner's sanity at the time of trial or thereafter. The record does not disclose that there has ever been a judicial determination as to whether or not petitioner was insane at the time of the commission of the offense for which he was convicted and sentenced to electrocution.

In addition to the reports of psychiatrists, there is lay testimony in the record casting doubts on the issue of petitioner's sanity.[5]

4. This letter was as follows:
"Pursuant to Section 2949.28 et seq. R.C., I wish to advise that the above-named inmate, under sentence of death, appears to be insane."
Warden Maxwell included in his letter a report of a staff psychiatrist which stated:
"On examination, he was found to be tense, rigid and unable to relax. He talks in a slow monontonous voice and is somewhat hesitant to reply to questions and when forced to reply is usually monosylobic. He talks readily about his past crimes and certainly shows very little feeling of remorse for same. "There seems to be some blunting of his emotional reactions but he demonstrates no discrepancy between the thought content and the emotional reactions. No hallucinations or delusions have been elicited nor has he been seen reacting to any. He is oriented as to time, place and person. Has a good grasp on recent and remote events and does well on the tests for retention and immediate recall. He is lacking in insight and judgment.
"Schaber was examined by H. J. Dietze, M.D., Psychiatrist, on the 26th of October 1961, and also by Allan R. Korb, M.D., Psychiatrist, on the 6th of November 1961, and they both made a diagnosis of Schizophrenic reaction, simple type.
"It is my opinion, that this diagnosis is correct and he, therefore has a mental illness, but it is also my opinion that said illness is not severe enough to call him legally insane."

5. For example, there is testimony to the following effect:
That the petitioner on occasions in his early years had convulsions and that on one such occasion he stopped breathing until artificial respiration was given; that at age five he fell from a moving car and rolled onto the pavement, striking his head on the pavement; that some time after this accident he began to have severe headaches, the eyes bulging out; that petitioner was slow and backward in school and the students called him "Grandpa"; that at age fifteen he was diagnosed as not getting along well with people, hating people, and was sent away to a school for improvement of this situation; that the petitioner finished the eighth grade at age 18 and never attended high

■ Under the facts and circumstances of this case we are of the opinion that petitioner was deprived of due process of law at his trial in the state court, under the standards applied in the decisions hereinabove cited, because of the failure of his counsel to file a written plea of "not guilty by reason of insanity" and the conclusive presumption of sanity in the absence of a written plea.

■ It is to be re-emphasized that petitioner was not in fact tried in the state court on his defense of insanity. There has never been an adjudication as to whether or not petitioner was sane at the time of the commission of the crime. His court-appointed counsel committed error that may have been disastrous to petitioner in trying the case upon a defense of insanity without complying with the Ohio statute. The three judges of the state trial court committed error that was most prejudicial in permitting counsel to rely upon his opening statement as a plea of "not guilty by reason of insanity." In practical effect there appear to be crucial points at which petitioner was denied altogether any effective representation by counsel.

This holding is not intended to be a reflection upon the character, integrity or professional reputation of either of the two court-appointed attorneys who represented petitioner in his criminal trial, both of whom are shown by the record to be reputable and experienced lawyers. We recognize that good lawyers can and do make mistakes; and in this case the mistake of counsel in a sense may have been induced by the failure of the trial court to indicate in any way that a written plea was necessary when counsel informed the court at the outset of the trial that petitioner was relying upon the defense that he was insane at the time of the commission of the crime.

The State of Ohio should be allowed a reasonable time in which to retry petitioner. Therefore, on remand, the district court should enter such orders as are appropriate and consistent with this opinion. Irvin v. Dowd, 366 U.S. 717, 729, 81 S.Ct. 1639, 6 L.Ed.2d 751.

Vacated and remanded.

school; that he was subject to blackouts and on two occasions he suffered what apparently were blackouts while driving, the facts of which he could not remember, as a result of which he lost his driver's license; that on certain occasions he had referred to a friend named "Jack" while talking to his father, saying that "Jack" made him drink whiskey and get drunk, and that his father recognized the description of "Jack" as being of the petitioner; that in his confession to the police he referred to "Jack" on several occasions, saying that it was "Jack's" idea to rob the taxicab; that Lt. Oehlers, who had known the petitioner for some time, recognized the description given as being that of the petitioner; that "Jack" has never been found to exist; and that petitioner's father testified that eight members of this family have been in mental institutions, four having died there and four being still confined. Lt. Oehlers further testified that during interviews the petitioner would complain of severe headaches, often asking him to return at a later time to complete the questioning; that when he gave the story of the murder he became very much upset and depressed and cried; that on another occasion he had become very much depressed, would trail off into no conversation at all and the interview would have to terminate because he would stop talking; and that petitioner had confessed to another shooting involving him and "Jack" but that this crime had never been found to have been committed.

Taped statements of the petitioner which were given to Lt. Oehlers indicate that on June 10, 1960, Schaber told Lt. Oehlers that "Jack" planned the robbery and that he was too scared to pull the trigger so "Jack" helped him. The report further indicates that on June 13, 1960, petitioner stated that he had committed the robbery alone but that he had information which would implicate "Jack" in a fatal knifing in South Bend, Indiana, and he was unable to provide information as to the location of the body. Petitioner further stated in these interviews with Lt. Oehlers that at the time of the robbery he had fifty dollars on his person and when asked why he decided to commit the robbery he stated that he "did not know what was coming off," that "everything went sort of blind inside," and that "everything happened so fast, he did not know what was coming off."